# THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI

IN THE MATTER OF THE SEARCH OF:

INFORMATION ASSOCIATED WITH
THE GOOGLE ACCOUNT
blucy0380@gmail.com THAT IS STORED
AT PREMISES CONTROLLED BY
GOOGLE LLC

Case No. 22-SW-2178DPR

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Stacy Lee Moore, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Google account that is stored at premises owned, maintained, controlled, or operated by Google LLC (hereinafter "Google"), an electronic communication service and/or remote computing service provider, headquartered at 1600 Amphitheater Parkway, Mountain View, California, within the Northern District of California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the Government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice ("DOJ"), and I am currently assigned to the Joplin, Missouri, Resident Agency of the FBI's Kansas City, Missouri, Division. As such, I am a "federal law

Case 6:22-sw-02178-DPR   Document 1-1   Filed 12/19/22   Page 1 of 16

enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

3. As part of my duties with FBI, I investigate criminal violations of Title 18 of the United States Code, including violations of 18 U.S.C. § 1201(a), kidnapping resulting in death, and § 3, that is, accessory after the fact to kidnapping resulting in death.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. I have probable cause to believe that evidence of the crime kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1), have been committed by the user of Google account blucy0380@gmail.com. There is also probable cause to search the information described in Attachment A for evidence, fruits, and instrumentalities of these crimes as further described in Attachment B.

**PROBABLE CAUSE**

6. On October 31, 2022, at approximately 6:30 p.m., Ashley Bush (Ms. Bush) was reported as a missing person to the Benton County, Arkansas Sheriff's Office by her fiancé, Joshua Willis (Mr. Willis). Mr. Willis reported that he had last seen Ms. Bush in the passenger seat of an older model, tan pickup truck on October 31, 2022, at the intersection of Highway 72 and Highway 43 in Maysville, Arkansas. Mr. Willis described the driver of the vehicle as a white female in her 40's, with shoulder length brown hair, whom Mr. Willis knew as "Lucy." Mr. Willis advised that Ms. Bush was approximately 31 weeks pregnant.

7. Mr. Willis informed Benton County Sheriff's Office investigators that on October 28, 2022, he and Ms. Bush met "Lucy" at the Gravette, Arkansas, public library. "Lucy" was

Case 6:22-sw-02178-DPR   Document 1-1   Filed 12/19/22   Page 2 of 16

driving the same older model tan pickup truck he had observed her in on October 31, 2022. During this meeting, Ms. Bush and "Lucy" discussed employment opportunities for Ms. Bush at a company called Conduent. Later in the evening, "Lucy" messaged Ms. Bush and told her that she wanted Ms. Bush to meet her supervisor at Conduent in Bentonville, Arkansas, on Monday, October 31, 2022, at 9:00 a.m. At approximately 11:00 p.m., on October 28, 2022, "Lucy" again messaged Ms. Bush and informed her that she would meet Ms. Bush at the Handi-Stop convenience store located in Maysville, Arkansas, on Monday, October 31, 2022, to take Ms. Bush to meet her supervisor at Conduent.

8. On October 31, 2022, Mr. Willis drove Ms. Bush to the Handi-Stop convenience store where Ms. Bush met "Lucy." Mr. Willis noted that "Lucy" was driving the same pickup truck that he had observed on October 28, 2022. At approximately 3:00 p.m., Mr. Willis received a text message from Ms. Bush stating that she was in Gravette, Arkansas, and on her way to the Handi-Stop convenience store where she had arranged to be picked up. Mr. Willis reported to the Benton County Sheriff's Office that while he was waiting for Ms. Bush to arrive, he observed the same older model pickup truck drive past the Handi-Stop convenience store and turn on to Highway 43 and travel north. Mr. Willis was able to observe that Ms. Bush was the passenger in the vehicle and that "Lucy" was driving. Mr. Willis attempted to contact Ms. Bush by phone but reported that the calls were going to voicemail.

9. On November 1, 2022, Benton County Sheriff's Office detectives met with Mr. Willis in Maysville, Arkansas. During this meeting, Mr. Willis informed the detectives that he had located Ms. Bush's cellular telephone on the side of Highway 43 in Maysville, Arkansas. Mr. Willis directed the detectives to the location where the telephone was located. The detectives recovered the phone and obtained the access code from Mr. Willis. Data obtained from Ms. Bush's

cellular service provider indicated that the telephone had been transported from Maysville, Arkansas, to a location in Pineville, Missouri, and then return to Maysville, Arkansas, several hours later.

10. When Benton County Sheriff's Office Detective Simpson returned Mr. Willis to the Handi-Stop convenience store, he was approached by Rick Burrow. Burrow told Detective Simpson that on October 31, 2022, he and Sawyer McGee were traveling south on Highway 43 near Maysville, Arkansas. While driving, he and McGee observed an unknown male subject throw a red and black cellular telephone from the window of his vehicle as the vehicle traveled north on Highway 43. Detective Simpson made contact with McGee who confirmed the information provided by Burrow and added that the vehicle in question was a blue or light gray Chevrolet pickup truck.

11. While reviewing the phone, detectives were able to locate a Facebook account for "Lucy." The account appeared to have been created on October 25, 2022, and the profile name was identified as "Lucy Barrow." Detectives located a public posting on the account that read "I have a bunch of baby items if any moms to be need them."

12. Detective Alison Nguyen with the Benton County Sheriff's Office issued an emergency request with Facebook, now Meta Platforms Inc, to request records associated with the Facebook profile of Lucy Barrow. Facebook provided information to Detective Nguyen indicating that the Lucy Barrow profile was created on October 25, 2022, at 00:22:45 UTC. The registration internet protocol (IP) address was identified as 2607:fb91:2f08:c891:c431:e452:f173:b495. Detective Nguyen was able to determine that this IP address was owned/maintained by T-Mobile. Detective Nguyen requested an emergency disclosure from T-Mobile and learned that this IP address was assigned to JAMIE WATERMAN, at 1848 Laughlin Ridge Road, Pineville, Missouri.

That residence is located approximately .15 miles from a cellular telephone that registered the presence of Ms. Bush's cellular telephone.

13. On October 31, 2022, a call was placed to the McDonald County, Missouri 911, reporting that AMBER WATERMAN was having a medical emergency related to her pregnancy. AMBER WATERMAN met with emergency medical technicians (EMT) at a store located in Longview, Missouri. When AMBER WATERMAN arrived at this location, she provided the EMTs with an unresponsive newborn infant. EMT personnel attempted to revive the infant, but their efforts were unsuccessful. The infant's remains were transported to the Ozark Funeral Home by EMT personnel.

14. On November 2, 2022, personnel with the Benton County, Arkansas medical examiner's office took custody of the deceased infant and transported the deceased infant from the Ozark Funeral Home to Benton County, Arkansas. The deceased infant was later transported to the Arkansas State Crime Laboratory in Little Rock, Arkansas where an autopsy was performed. During the autopsy, medical examiners examined the placenta that was recovered with the deceased infant and determined that a partial uterus and at least one ovary was attached to the placenta. Medical personnel determined that the deceased infant had been removed from the mother and was not born naturally. DNA from the deceased infant was also collected.

15. On November 1, 2022, Benton County Sheriff's Office detectives arrived at the home of JAMIE and AMBER WATERMAN in connection with the investigation of Ms. Bush's disappearance. While on scene, the detectives noted that a tan Chevrolet pickup truck located on the property contained what appeared to be a large amount of blood within the vehicle.

16. On November 3, 2022, a state search warrant, issued in McDonald County, Missouri, was served at the residence located at 1848 Laughlin Ridge Road, Pineville, Missouri.

The search was conducted by members of the McDonald County Sheriff's Office, the Benton County Sheriff's Office, and the FBI. The FBI evidence response team members from the Kansas City and the Little Rock Divisions participated in the search.

17. While the search was being executed, FBI SA Brenan Despain, FBI Task Force Officer Kris Moffit, and Benton County Sheriff's Office Detective Patrick Stuart traveled to JAMIE WATERMAN's place of employment and conducted a non-custodial interview of JAMIE WATERMAN. During this interview, JAMIE WATERMAN advised that on the evening of October 31, 2022, he discovered that there was blood inside the tan colored Chevrolet pickup truck. JAMIE WATERMAN assumed that the blood came from his wife AMBER WATERMAN due to her pregnancy complications. When JAMIE WATERMAN questioned AMBER WATERMAN about the blood, AMBER WATERMAN did not acknowledge the source of the blood. JAMIE WATERMAN watched AMBER WATERMAN clean the blood from the pickup truck and thereafter, the rags used to clean the blood were burned in a burn barrel located in front of the residence by AMBER WATERMAN. JAMIE WATERMAN then collected trash from the residence and burned the trash in the same burn barrel.

18. JAMIE WATERMAN stated that when Benton County detectives arrived at his residence on November 2, 2022, he was aware that Ms. Bush had been reported as missing. JAMIE WATERMAN learned of this through social media coverage. After the detectives left the residence at approximately 5:00 a.m. on Wednesday, November 2, 2022, AMBER WATERMAN informed JAMIE WATERMAN that she had killed Ms. Bush and then quickly changed her story and said that "Lucy" had killed Ms. Bush.

19. At approximately 6:30 a.m., AMBER WATERMAN led JAMIE WATERMAN to Ms. Bush's body. JAMIE WATERMAN stated that the body was clothed and was lying face-down

next to a boat next to the house. The body was covered with a blue tarp. AMBER WATERMAN removed a ring from Ms. Bush's finger and rolled the body onto the blue tarp. JAMIE WATERMAN dragged the body on the tarp to a fire pit behind the residence and AMBER WATERMAN asked JAMIE WATERMAN to get gasoline. JAMIE WATERMAN brought a gallon of chainsaw bar chain oil to AMBER WATERMAN. AMBER WATERMAN proceeded to light the tarp and poured about 1/3 of the oil over the body. AMBER WATERMAN then began collecting wood to throw on the fire. JAMIE WATERMAN stated that he dragged a small sofa next to the fire and believes that AMBER WATERMAN put the sofa into the fire. After the fire burned for about one hour, AMBER WATERMAN doused the fire with water from a garden hose and JAMIE WATERMAN removed the body from the burn pile.

20. When JAMIE WATERMAN attempted to move the body, the body was still very hot, so JAMIE WATERMAN went to a shed located on the property and retrieved a new tarp. The tarp was placed next to the body and JAMIE WATERMAN rolled the body onto the tarp.

21. After placing the body on the tarp, the body was moved onto the bed of JAMIE WATERMAN's blue 1993 GMC pickup. The blue 1993 pickup was similar in description to the vehicle observed by witness Sawyer McGee in the vicinity of where Ms. Bush's cellular telephone was discovered near Maysville, Arkansas. JAMIE WATERMAN and AMBER WATERMAN drove the body to an area within a short distance from their residence. JAMIE WATERMAN stated that his pickup truck was having transmission problems and could not travel far. After arriving at the spot where the body was to be hidden, JAMIE WATERMAN and AMBER WATERMAN removed the body from the bed of his pickup truck and placed it on the ground. AMBER WATERMAN then removed the tarp. JAMIE WATERMAN and AMBER WATERMAN drove back to their residence where AMBER WATERMAN burned the tarp.

22. JAMIE WATERMAN was asked if he could show the interviewers where the body was taken to, and JAMIE WATERMAN agreed. At this time, SA Despain and TFO Moffit seized a cellular phone from JAMIE WATERMAN. During this interview, JAMIE WATERMAN confirmed that (479) 326-2437 was his cellular telephone number. JAMIE WATERMAN then led agents and detectives to where he and AMBER WATERMAN had left the body. Upon arrival at this location, a charred human body, later identified as Ashley Bush, was discovered.

23. During the search of the residence located at 1848 Laughlin Ridge Road, the FBI evidence response team members discovered a charred human hand and bone fragments located in a burn pile behind the residence.

24. During the autopsy of Ms. Bush, it was determined that she suffered a gunshot wound to the torso.

25. On December 5, 2022, Benton County, Arkansas Sheriff's Office Detective Susan Matthews provided your Affiant with records received from Facebook for Facebook user ID 100087245287695, the account used by Facebook user "Lucy Barrow." In reviewing these records, I observed that email address blucy0380@gmail.com was the registered email address for this account. Based on my training and experience, I know that Facebook confirms that registered email addresses are active at the time the Facebook account is created and that the individual that created the "Lucy Burrow" Facebook account would have had an active Google account.

26. On December 7, 2022, I issued a preservation request for the Google account blucy0380@gmail.com through the Google law enforcement portal. Google acknowledged receipt of the preservation request and assigned a reference ID of 27753633 for this request.

## BACKGROUND CONCERNING GOOGLE

27. Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

28. In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

29. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

30. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

31. Google provides email services (called "Gmail") to Google Accounts through email

addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

32. Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user hasn't disabled that feature or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

33. Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called

"Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them. Google Keep is a cloud-based notetaking service that lets users take notes and share them with other Google users to view, edit, or comment.

34. Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the option to sync their mobile phone or device photos to Google Photos. Google preserves files stored in Google Photos indefinitely, unless the user deletes them.

35. Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.

36. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their

Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

37. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

38. Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

39. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

40. Google collects and retains data about the location at which Google Account services are accessed from any mobile device, as well as the periodic location of Android devices

while they are in use. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google Account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google Account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a meter radius margin of error. Inferential data is stored with an account's Web & App Activity. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

41. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

42. Based on my training and experience, messages, emails, voicemails, photos, videos,

documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation. Given the facts above, any emails retrieved from the Google account through this search warrant will provide evidence of who controlled the account and will show the tactics used by the perpetrators to defraud victims such as Campos, and victims that have not yet been identified.

43. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

44. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

45. Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

46. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

47. Based on the foregoing, I request that the Court issue the proposed search warrant.

48. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

49. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

STACY LEE MOORE
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me via telephone on the __19th__ day of December 2022.

HONORABLE DAVID P. RUSH
Chief United States Magistrate Judge
Western District of Missouri